## No. 11,611.

JOHN WHITCOMB vs. LOUISVILLE & NASHVILLE RAILROAD COMPANY.

The proof disclosing that a small boy had approached a train, just at the moment it was about to come to a halt, and was standing so close to one of the steps of the car that a forward movement of the train brought it in contact with a basket on his arm, pulled him down, and caused his leg to be run over and broken, a case of negligence is not made out against the railroad company.

There being no contractual, or even *quasi*-contractual relations between the parties, and the operatives and employés of the company being unaware of the presence of the boy, the occurrence must be regarded as an unfortunate accident for which the defendant is not liable in damages.

APPEAL from the Civil District Court, Parish of Orleans. *Rightor, J.*

*Morris Marks* and *A. H. Leonard* for Plaintiff, Appellant, cite 51 Mich. 601; 47 Am. Rep. 596; 13 Am. and Eng. R. R. Cases, 29; 64 Texas, 251; 53 Am. Rep. 756.

*Denegre & Denegre* for Defendant, Appellee.

The opinion of the court was delivered by

WATKINS, J. This action is for thirty-five thousand dollars damages sustained by the ten-year-old son of the petitioner, by reason of serious injuries inflicted upon him by the defendant, through the gross carelessness and neglect of its officers, agents and employés.

The case was submitted to and tried by the judge of the court below, and decided in favor of the defendant, and the plaintiff has appealed.

The plaintiff's averments are, substantially, that on the 6th of September, 1892, one of the trains of the defendant, which was used and employed in operating what is commonly known as the Pontchartrain Railroad, between Milneburg and the city of New Orleans, "stopped near the depot or station of said road, on Elysian Fields street of said city, near the river, (where) it was usual and customary, when the train was so stopped, to detach the locomotive from the cars, to run the locomotive some distance from there, and to leave (them) stationary for some time." That John Whitcomb, Jr., who was crossing Elysian Fields street, on his way to his father's

15

place of residence, at or nearly about the time when the train was so stopped—who knew the locomotive would, in the usual course of things, be detached from said cars, leaving them stationary, and who, therefore, did not and could not reasonably anticipate any danger to himself from so doing, stopped, as he was crossing said street on his way home, *and stood near to one of the cars* of said train. That the engineer, conductor and other officers and employés of said company intended and attempted to detach the said locomotive from said (train), and to leave the cars standing; but, through gross carelessness and neglect, failed to detach the locomotive from the cars, and, without whistling, ringing the bell, or giving any signal, put the locomotive in motion, which, moving off, carried with it, unexpectedly to the said John Whitcomb, Jr., the cars of said train, which (by) moving, struck him, the said John Whitcomb, Jr., and threw him to the ground, he falling so (that) the wheel of one of the cars ran over his leg, or struck same so as to break the bone thereof.''

The · follows the general averment, that the injury thus inflicted occasioned the plaintiff's son great pain and suffering, necessitated the employment of skilful physicians in order to save his life, and resulted in his being sent to the Charity Hospital, where his broken leg was first amputated just below the knee, and subsequently just above the knee—requiring constant and prolonged nursing, attention and care for a period of several months.

That, as the result of the injury inflicted, John Whitcomb, Jr., is permanently disabled, thus engendering great expense in his maintenance, and subsequent deprivation of his services to his parents, and on that account claim is made for five thousand dollars.

That John Whitcomb, Jr.'s mother—petitioner's wife—was, as the result of said injuries to her son, subjected to great trouble, anxiety and mental suffering, and was thereby damaged in the sum of five thousand dollars.

That said John Whitcomb, Jr., has personally suffered damages to the extent of twenty-five thousand dollars.

This is the plaintiff's case.

The defendant first excepted on the ground that the plaintiff's petition disclosed no cause of action, but same having been overruled it filed an answer.

The answer is a general denial, coupled with an averment that '' if

plaintiff's (son) was injured, his injuries were the result of his own negligence and carelessness," and that judgment should go against him.

We subjoin the "statement of the case" that is furnished to the court in plaintiff's brief, viz.:

"It is and always has been the custom of defendant company to run its trains from the lake to a point on Elysian Fields street, near the station or depot between Chartres and Royal streets, and there stop. The locomotive is *immediately* detached from the train of cars and moves off, leaving the cars stationary. This custom was well known to the child of plaintiff, who lived for some time near and in sight of the place where the train so stopped. On the 6th day of September, 1892, about 12:30 P. M., John Whitcomb, Jr., was sent by his mother to a grocery store, on the down town side of Elysian Fields street, to get some ham and some claret for his father's lunch. The boy carrying a basket went to the grocery, got some ham, which he put in the basket, and a bottle of claret, and started back home carrying the basket on *his right arm* and the bottle *in his left hand*. On his way back, after crossing Elysian Fields street he noticed that a train was coming in from the lake. His father had some days before told the boy that he would take him (the boy) to the lake fishing, and told the boy to find out from a fisherman named Manuel whether the fish were biting at the lake. As this was a matter in which Johnny, like all boys, felt a deep interest, he determined to see if Manuel was on that train, so he sat on a float standing in the street in front of a blacksmith's shop and opposite the point where the train usually stopped, and *about six feet from that point*, until the train arrived.

"The train, composed of a locomotive and three cars, arrived and stopped. The boy, still carrying the basket on his right arm and the bottle of wine in his left hand, went from the float to the train, a distance of only six feet, and stood near the front platform of the last car, looking to see if Manuel was on the train, when suddenly and without any warning the car, with a sudden jerk, was put in motion, the step caught the basket on the boy's arm and threw him down, so that the wheel of the last car ran over his leg, breaking and crushing the bone, and almost severing his foot from his leg."

On this hypothesis counsel for plaintiff claim that "when the train stopped, the brakeman erroneously supposed that he had de-

tached the locomotive from the train and gave the signal to the engineer, who started the locomotive, which, not being detached from the train, gave a sudden jerk to the cars, and pulled them along the track a distance of more than ten feet, when the locomotive was stopped again.''

This statement is, substantially, sworn to by the wounded boy, and his testimony is corroborated by three other of the plaintiff's witnesses.

One of them says: ''I was standing at the corner of Royal and Elysian Fields streets, and Johnny Whitcomb was standing right by the car, and the car made a start and knocked him down. Then after he fell I went over there to see what was the matter, and when they took him from under the cars he had his leg broken, and they took him across the street to the steps, and I went over there to look at him. This is all I know about it.''

John Whitcomb's statement is as follows:

'' I was standing on Elysian Fields street. When the train had stopped I went there to look for Mr. Manuel, but the train started off and knocked me down.''

Again:

'' I had been sitting on a float, and had just got down in front of the train after it stopped between Royal and Chartres streets, and I was looking for a man named Manuel, because my father had told me to ask him if the fish were biting at the lake. The train had stopped then, but it started off again without giving any warning and knocked me down.''

Again:

'' I was sitting on a float and got off the float after the train had stopped.   *   *   *   It was right in front of the wheelwright's shop on Elysian Fields street, between Chartres and Royal streets.   *   *   * About six feet from the train.   *   *   *   I was standing by the train after it had stopped, and when it started the step caught my basket and threw me down.   *   *   *   I was looking at the train; looking to see if Mr. Manuel was getting off the train.   *   *   *   It was the first step of the last coach.''

Accepting this plain, intelligent statement of the injured boy, and it is evident to our minds that a case for damages is not made out against the defendant.

There were no contractual or even *quasi*-contractual relations be-

FORTY-SEVENTH ANNUAL REPORTS, 1895.     229

State ex rel. Noble et al. vs. Judge.

tween the injured boy and the defendant.   Nor do we think it can be said that he was a trespasser on defendant's track.

He had evidently awaited the arrival of the train for the purpose of seeing his friend, and when the train had arrived and temporarily halted, he dismounted from the float where he had been sitting and walked toward it for the purpose of seeing if he had come in from the Lake.   In doing so he ventured too near the step, and by the sudden and unexpected forward movement of the train he was knocked down and his leg run over and crushed by one of the car wheels, the step having come in contact with his basket and pulled him down.

Under these circumstances the defendant was guilty of no fault, as the boy's presence in the close vicinity of the cars was unknown to any of its employés.

The contention of the defendant's counsel and the tendency of its proof is to the effect that in fact the train had not completely come to a halt at the time of the accident; and the declaration of the engineer operating the train is that the locomotive was clearly and completely uncoupled from the train after it came to a halt, and that there was no hitch or after-movement of the train for the cause assigned.

We regard the occurrence as an unfortunate accident, for which the defendant is not responsible.

Judgment affirmed.

Rehearing refused.